**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ELLIOT J. SCHUCHARDT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-01017** |
| | ) | **Judge Aleta A. Trauger** |
| **BLOOMBERG L.P. et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Pro se Plaintiff Elliot J. Schuchardt filed this action to bring defamation, false light, and intrusion claims under Tennessee law against Defendants Bloomberg Industry Group, Inc., and journalist Roy Strom. Schuchardt's claims address two articles published in *Bloomberg Law* regarding another case now proceeding in this court, in which the plaintiffs—initially but no longer represented by Schuchardt—challenge the use of charitable donations by former National Rifle Association (NRA) President Wayne LaPierre. *Dell'Aquila v. LaPierre*, Case No. 3:19-cv-00679 (M.D. Tenn. Aug. 6, 2019) (the "NRA Litigation").

Bloomberg and Strom have moved to dismiss Schuchardt's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 27.) Schuchardt has responded in opposition. (Doc. No. 31.) Bloomberg and Strom filed a reply (Doc. No. 36.) Schuchardt also has moved to strike the exhibits filed with the defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(f). (Doc. No. 29.) Bloomberg and Strom have responded in opposition to the Motion to Strike (Doc. No. 37), and Schuchardt filed a reply (Doc. No. 40.)

For the reasons that follow, Schuchardt's Motion to Strike will be denied, and the defendants' Motion to Dismiss will be granted.

## I. BACKGROUND

### A. Factual Background

The following allegations are taken from Schuchardt's Amended Complaint (Doc. No. 25) and are assumed to be true for purposes of the Motion to Dismiss.

Schuchardt "is a 1993 graduate of Columbia Law School" whose professional experience includes work "with large law firms in New York, Philadelphia and Washington, D.C." and operating his own law firm from 2003 to 2022. (Doc. No. 25 ¶¶ 6, 8–9.) Schuchardt "focused his practice on civil liberties issues," including serving as counsel in several high-profile matters. (*Id.* ¶¶ 11–12.) Schuchardt alleges that his law license was first "attacked" in 2017 when he represented a client in the Bankruptcy Court for the Eastern District of Tennessee. (*Id.* ¶ 27.) Schuchardt alleges that his adversaries in that proceeding, including a local Chapter 13 bankruptcy trustee, raised disciplinary issues against him to "gain [an] advantage" in the bankruptcy. (*Id.*) "As a result of these partisan attacks, . . . Schuchardt w[as] suspended from practicing law in the Eastern District of Tennessee." (*Id.*)

"Between October 1, 2017 and October 16, 2021, Schuchardt represented [David] Dell'Aquila in a probate case[1] involving the assets of Dell'Aquila's deceased father."[2] (*Id.* ¶ 20.) Schuchardt "won the case" at the trial level and on appeal. (*Id.* ¶ 22.) Schuchardt "performed most of his work for Dell'Aquila in the probate case on credit, with the understanding that he would be

[1] The case was filed in the Probate Court for Davidson County, Tennessee in Nashville. (Doc. No. 25, at 4 n.3.)

[2] Schuchardt states that he did not name Dell'Aquila as a defendant in this action because Dell'Aquila is a Tennessee resident, and his inclusion would destroy the court's diversity jurisdiction. (Doc. No. 25, at 3 n.2.)

paid from the assets of the estate." (*Id.* ¶ 23.) "While the probate case was pending, Dell'Aquila asked Schuchardt to represent him in a case against the National Rifle Association ['NRA']." (*Id.* ¶ 24.) Schuchardt disclosed his suspension from practice in the Eastern District of Tennessee to Dell'Aquila "in connection with the probate case and the NRA matter." (*Id.* ¶ 28.) Schuchardt alleges that Dell'Aquila later "decided to use this information to slander Schuchardt's reputation for his own purposes." (*Id.* ¶ 29.)

Schuchardt was still representing Dell'Aquila in the probate matter in the summer of 2021 and, Schuchardt states, Dell'Aquila was "refusing to settle litigation in the case, because he did not want to distribute a portion of the estate's assets to his half-sister." (*Id.* ¶ 31.) Schuchardt asked Dell'Aquila to pay his fees, "which w[ere] approximately $97,000, for four years of work," to continue the representation. (*Id.* ¶ 32.) Dell'Aquila refused, and Schuchardt ended his representation in the probate matter on August 16, 2021, telling Dell'Aquila that he intended to pursue collection of his fees. (*Id.* ¶¶ 32–33.) On August 31, 2021, Schuchardt sued Dell'Aquila for "breach of contract, breach of fiduciary duty, fraud, and quantum meruit in connection with the probate case." (*Id.* ¶¶ 36–37.) Schuchardt states that Dell'Aquila responded "by conducting a slander campaign against Schuchardt," in which Dell'Aquila "publicized the partisan attacks against Schuchardt's license to practice law." (*Id.* ¶¶ 38–39.) Dell'Aquila filed a complaint against Schuchardt with the Tennessee Board of Professional Responsibility on May 18, 2022 and, later, with the Pennsylvania Board of Professional Responsibility. Schuchardt states that the complaints contained knowingly false allegations and were made "in an effort to maliciously interfere with Schuchardt's license to practice law" in those jurisdictions. (*Id.* ¶¶ 41–43.)

Schuchardt "briefly represented Dell'Aquila" in the NRA Litigation but "was forced to withdraw from the case, due to partisan attacks on his license to practice law." (*Id.* ¶¶ 25–26.) He

alleges that "Dell'Aquila delayed in retaining new counsel for the NRA case for nearly a year – from September 3, 2021," when Schuchardt was notified that he could not practice law in this court, "until August 16, 2022," when new counsel appeared for the NRA Plaintiffs. (*Id.* ¶¶ 46 & n.7.) Schuchardt claims that, "[a]s part of his slander campaign, Dell'Aquila began to publicly claim that Schuchardt was responsible for Dell'Aquila's delays in the [NRA Litigation]," including that "Schuchardt had 'damaged' the NRA case due to his suspension in the Eastern District of Tennessee." (*Id.* ¶¶ 47–48.) "Dell'Aquila also claimed that Schuchardt's association with the NRA case was 'preventing' Dell'Aquila from finding new counsel for the case." (*Id.* at ¶ 50.) Schuchardt alleges that, in truth, "Dell'Aquila could not find new counsel for the NRA case because Dell'Aquila made little effort to do so" and "refused to pay a retainer to hire a new attorney." (*Id.* ¶ 51.) Schuchardt states that Dell'Aquila "filed a copy of Schuchardt's [Eastern District of Tennessee] suspension order in the NRA case, in an effort to buy more time from the court" to find counsel. (*Id.* ¶ 53.)

Schuchardt alleges that Strom "noticed the [suspension] order on the [NRA Litigation] docket sheet and called Dell'Aquila for comment." (*Id.* ¶ 54.) In telephone interviews, Dell'Aquila "told Strom that Schuchardt was the cause for the delays in the NRA case." (*Id.* ¶¶ 55–56.) "As a result of these conversations, Strom began researching an article about Schuchardt" and "contacted Schuchardt on several occasions for comment on the proposed article." (*Id.* ¶ 57.) Schuchardt states that, during these recorded conversations, he told Strom "that Dell'Aquila was the cause for the delay in the NRA case," that "Schuchardt had no ability to affect the case since September 3, 2021," and that "the case had been administratively closed until April 11, 2022, due to the NRA's bankruptcy case"—all information Schuchardt states "was readily available on the court's docket sheet." (*Id.* ¶ 58.) Schuchardt also told Strom that "he could not represent Dell'Aquila in the case

due to attacks on Schuchardt's license" and that "Dell'Aquila had a motive to slander Schuchardt's reputation, due to the ongoing fee litigation relating to the probate case." (*Id.* ¶ 59.) Schuchardt alleges that Strom "ignored the information that Schuchardt provided" and "chose to publish an article which defamed attorney Schuchardt, and knowingly placed Schuchardt in a false light." (*Id.* ¶ 61.)

### *1. The August 10, 2022 Article (the First Article)*[3]

Strom published the First Article addressing the NRA Litigation in *Bloomberg Law* on August 10, 2022. The First Article reads in full:

> ***How Suspended Lawyer Derailed NRA Donors' $1 Billion Claim***
>
> - A 'great case' until greed got in the way, plaintiff asserts
> - Boies Schiller partner backed out over disputes with local counsel
>
> For a Tennessee lawyer used to shepherding personal bankruptcies for $1,250 a pop, the case that landed in Elliott Schuchardt's lap offered the potential reward of a lifetime: A legal fee worth millions and a class-action victory against one of the most powerful interest groups in US history.
>
> Schuchardt in 2019 helped build a case alleging that the National Rifle Association had bilked donors to pay for the lavish lifestyles of its leaders. The lawsuit sought the return of possibly hundreds of millions in contributions to once-loyal NRA members. By one estimate, the case could have cost the NRA $1 billion.
>
> But behind the scenes, it was on a path to failure.
>
> Before he formally joined the case, Schuchardt's license to practice in federal court had been suspended amid a dispute with a bankruptcy judge in Knoxville who questioned his fees, professionalism and competency. Then his bid to enlist some heavyweight help against the NRA—a partner from New York's Boies Schiller

[3] Schuchardt attached copies of the First Article and Second Article as exhibits to his original Complaint (Doc. No. 1). He did not include them as exhibits to his Amended Complaint but stated that he incorporated the original exhibits by reference. (Doc. No. 25, at 10 n.9.) The defendants, however, included the articles as exhibits to their Motion to Dismiss (Doc. Nos. 28-1, 28-2). Because Schuchardt included the articles with his original pleading, and because they are plainly central to his claims, the court considers them as if they had been included as exhibits to the Amended Complaint.

Flexner—crashed when they couldn't resolve Schuchardt's role or how much he should be paid.

Now, no lawyer represents the NRA donors, and a judge has set an Aug. 17 deadline, warning that he'll toss the proposed class action without a new lawyer to get it back on track.

Why no firm has signed on to a case that won an early ruling—and could get a boost from a parallel investigation by New York Attorney General Letitia James—remains something of a mystery.

The lead plaintiff, Nashville gun rights activist David Dell'Aquila, blames Schuchardt for dooming their chances in court, and, more importantly, Dell'Aquila's bid to reform the organization. Schuchardt waited more than a year after his suspension to withdraw from the case and has since tussled with Dell'Aquila over who's responsible for finding new representation.

"This was a great case," Dell'Aquila said in an interview, "until Elliott put his greed ahead of everybody."

In two short phone conversations with Bloomberg Law, Schuchardt was reluctant to discuss the case, but said Dell'Aquila was trying to shift blame for his own failure to find a lawyer. He declined to discuss the fee dispute but threatened to sue if his former client slandered him.

Schuchardt, 55, also said he has retired from practicing law. In one of the calls, he defended his record.

"This was excellent legal work that I was performing for all of these clients," he said.

**An Unlikely Advocate**

The story of how a massive lawsuit against America's most prominent gun rights organization floundered in the hands of a suspended lawyer begins with the death of Dell'Aquila's father in 2017.

A former lawyer in Pittsburgh, the elder Dell'Aquila left an estate valued around $500,000. His son, who says he's a self-made millionaire and had promised as much as $10 million to the NRA, was tasked with settling his father's estate with his siblings.

After asking around for attorney recommendations, including a chat with an NRA lawyer, Dell'Aquila was referred to Schuchardt.

A 1993 Columbia University School of Law graduate, Schuchardt worked as an associate at white-shoe firms including Paul Weiss Rifkind Wharton & Garrison and Dechert before hanging his shingle in Knoxville in 2003.

Among the career accomplishments he cites are lawsuits he filed against the Obama and Trump administrations, alleging the National Security Agency illegally intercepted Americans' emails, claims based on documents obtained by whistleblower Edward Snowden. While Schuchardt won an early victory granting him the standing to sue, a federal appeals court ultimately tossed the case, finding his evidence too flimsy to be admissible in court.

That case exemplifies Schuchardt's legal career. He seems to relish playing the David to a Goliath, even if his slingshot occasionally misfires.

By 2019, Schuchardt had signed on as Dell'Aquila's probate lawyer. His client's attention soon turned toward a case he was building against an organization he loves.

Dell'Aquila had been a longtime NRA member, and his largesse gave him access to its leaders, including private dinners with CEO Wayne LaPierre and others. But he had grown disillusioned.

Reports alleging financial malfeasance at the top matched his own concerns. Dell'Aquila said he couldn't get answers to his questions about how the NRA was spending gifts from six-figure donors.

He decided to halt his donations until the group removed the leadership he viewed as distracting from the goal of preserving and expanding Second Amendment rights.

"I'm not pro-Mr. LaPierre, and I'm not anti-Mr. LaPierre, I'm just simply being objective and trying to save a historic institution from itself," Dell'Aquila told the New York Times in a 2019 story about NRA donors lobbying for reform.

His decision to sue to [sic] the group, he reasoned, was about effecting change more than winning a payout. In August 2019, Dell'Aquila persuaded Schuchardt to help him draft the lawsuit; he filed it himself.

"I paid him $5,000 and he wrote it up," Dell'Aquila said in an interview. "Chances are, we weren't going to get standing. Nobody thought we would. But we did."

**A Bankruptcy Break**

At the time, Schuchardt had been dealing with the fallout of a war he'd waged with a bankruptcy judge in Knoxville, with his ability to work in Tennessee federal courts dangling in the balance.

The judge, Suzanne Bauknight, had accused Schuchardt of overcharging clients, incompetence and of falsely accusing her of improper communications with a US trustee in one of his cases.

Schuchardt asserted he was being targeted because the judge and the local trustee—who serves as a sort of referee protecting bankrupt individuals' interests—had an axe to grind against his new employer, Upright Law. The firm, which has stirred controversy and scrutiny over its tactics, signs up clients through its website and a Chicago-based intake center then doles them out to local partners across the country.

Bauknight did not appreciate the accusation; she started disciplinary proceedings. In a January 2018 order, Bauknight had raised questions about Schuchardt's conduct and competency in 17 cases, saying he exhibited "either a lack of basic bankruptcy knowledge" or "a refusal to adequately research issues."

Schuchardt agreed to a six-month moratorium on handling bankruptcy petitions in the Eastern District of Tennessee, but their detente didn't last. That June, Bauknight accused him of continuing to represent clients—an allegation he denied— and sought steeper sanctions.

Schuchardt fought back, and the case sat unresolved for a year. Then, on Dec. 10, 2019, the district's chief judge, Pamela Reeves, suspended Schuchardt for two years, citing a lack of ethics and professionalism. "His conduct has fallen below that required of members of the bar of the Eastern District of Tennessee," she wrote.

The penalty also automatically barred Schuchardt from practicing in the Middle District of Tennessee, which includes Nashville, and required him to alert that court of his status. He didn't.

Instead, nine days after being suspended, Schuchardt formally entered his appearance to represent Dell'Aquila and other NRA members in the proposed class action.

Schuchardt told Bloomberg Law he believed he was compliant with all the rules of the Middle District when he entered his appearance there. He acknowledged he had been "slow in reporting the suspension" but declined to elaborate.

**A Texas Two-Step**

Unaware of the suspension, US District Judge William Campbell handed the plaintiffs an early decision they saw as a victory. In September 2020, he dismissed the racketeering claim against the NRA and a separate one against LaPierre—but allowed the fraud charge against the NRA to move forward.

The class-action theory is that the NRA solicited donations promising they'd be spent advocating the Second Amendment, not funding LaPierre's trips. If the plaintiffs successfully argue that all donations to the NRA were collected fraudulently, they could seek to recoup contributions made from late 2015 through early 2019— a sum in excess of $330 million, records show. If the RICO allegation had held, or was reinstated, the damages would triple.

Michael Kanovitz, a Chicago-based lawyer at Loevy & Loevy who's handled large class-action claims and reviewed the case for Bloomberg Law, said a billion-dollar award was "probably pie-in-the-sky money" but that the claim otherwise has merits. "It's absolutely a viable lawsuit," he said.

A key issue, he said, would be how broad the judge views the alleged fraud. Would donors have given the NRA nothing if they knew the wasteful spending was occurring? Or do they deserve lesser compensation, closer to the amount wasted by the executives?

The NRA contends the lawsuit is baseless. "The majority of Mr. Dell'Aquila's claims have been rejected by the courts—evidence this is a frivolous pursuit," NRA lawyer William A. Brewer III said in a statement. "The NRA's commitment to good governance is clear."

But Dell'Aquila and Schuchardt's case got a potential boost from an unlikely source. In August 2020, the New York Attorney General had announced her own, similar fraud case against the NRA, a nonprofit incorporated in the Empire State. She sought to dissolve the group.

The gun-rights group assailed the New York Democrat's suit as politically motivated. But by January 2021 the NRA had filed for bankruptcy protection in Texas, saying it would reincorporate there—an effort James panned as a tactic to evade her investigation.

That meant Dell'Aquila, because of his lawsuit, became a creditor in the bankruptcy proceeding there, and that the class-action would be stayed in Tennessee. It also meant he needed lawyers in Texas.

Dell'Aquila enlisted Dallas-based attorney Walter Herring to represent him personally and find Texas lawyers to jump into the case. But the political calculations were tricky.

"The class-action lawyers I talked to, some of them hate the NRA and were excited just to file a lawsuit against them," Herring said. "Another group I talked to said, 'These people you're talking to hate the NRA. They want to take on this case because they want to destroy the NRA.' So it was curious bedfellows in that regard."

**A Deal Falls Apart**

In the end, the bankruptcy case was short-lived. A judge tossed it in May 2021, finding the NRA was improperly trying to use it "to address a regulatory enforcement problem."

So the class-action, with Schuchardt at the helm, was back on the front-burner in Tennessee federal court. But he needed help; the NRA already had five lawyers

enter appearances on its behalf, including Brewer, one of the alleged "insiders" cited in Dell'Aquila's complaint.

Schuchardt turned to one of the nation's most prominent firms: Boies Schiller. Founded by trial lawyer David Boies, its litigators had successfully waged class-action battles against powerful adversaries. Just months earlier, it had negotiated a $2.7 billion antitrust settlement with Blue Cross Blue Shield that was poised to net lawyers more than $600 million.

By late last summer, Schuchardt had a signed agreement from Peter Skinner, a former Manhattan federal prosecutor and the head of Boies Schiller's government investigations and white-collar practice group. At the time, Skinner had just finished representing Nike in the federal extortion case against celebrity lawyer Michael Avenatti.

Then Schuchardt told Skinner about his suspension. The Boies lawyer was floored; in emails Dell'Aquila shared with by [sic] Bloomberg Law, Skinner insisted Schuchardt had to fully back out of the case.

Despite his suspension, Schuchardt played hardball, telling his would-be co-counsel he deserved a flat percentage of any award, and brushing aside any suggestion he was just in it for the money.

"My track record speaks for itself," Schuchardt wrote in one email. "As for finances, I am richer than you think."

Skinner repeatedly told the Knoxville lawyer he was entitled to some compensation for his work to that point but that he couldn't expect a percentage fee of any award. Skinner said judges decide how lawyers get paid in class-action cases and that's based on the amount of work each lawyer performs.

For weeks, the two lawyers argued how to move forward, according to the emails. Skinner's final offer: "You play no role going forward and are paid on a proportional basis for the work you did before you withdrew."

Schuchardt again demanded a 9% fee; Skinner terminated the agreement three days later. "As the only attorney of record in the case, I am sure you will do whatever is necessary to zealously represent your clients," he wrote.

After reading Skinner's termination letter, Dell'Aquila sent Schuchardt an email demanding he withdraw from the case or else be fired. "Once again, this is about reforming the NRA and not about you and your desire to obtain a multi-million-dollar payout!" he wrote.

The Dallas bankruptcy attorney, Herring, also intervened and urged Schuchardt to reconcile with the New York lawyers. It didn't happen.

"He's a solo practitioner trying to make a living," Herring said in an interview. "I do think the money became the issue there."

Schuchardt finally disclosed his suspension to court officials in Nashville, and, in September, was informed he'd been ineligible to practice there before he even filed an appearance in the NRA case. He halted work on the class-action, but never formally withdrew his appearance. The case sat dormant for months.

In April, a lawyer representing Dell'Aquila in a separate matter wrote Schuchardt and told him it was his responsibility to find alternate counsel in the class action or be held liable for any losses.

That same month, the NRA lawyer, Brewer, called Schuchardt to discuss the case and learned he no longer represented Dell'Aquila and the others.

Brewer then petitioned Judge Campbell to dismiss the suit for lack of prosecution. That motion is pending.

**A Relationship Ends**

A judge in March rejected the New York attorney general's effort to dissolve the NRA. But two months later, she won new momentum on the fraud claims, when a judge rejected the NRA's argument that James lacked the authority to bring her suit.

Meanwhile, Dell'Aquila has struggled to persuade anyone to take his case; he said he's talked to at least 50 lawyers. But the firms he's cold-called often don't return his calls, he said, and even his conversations with prominent figures in Second Amendment circles haven't been fruitful.

He wonders if the case is too political or if public interest has waned around the NRA's spending.

"Elliott worked on [enlisting] Peter for three months," he said. "It's not as easy as you think."

He's also battling Schuchardt on another front. His father's estate is not yet wound down, and his former lawyer is suing him for nearly $100,000 in unpaid legal fees in the probate case.

Dell'Aquila said Schuchardt needs to request his fees from the probate judge. He's also filed a complaint against Schuchardt with the Tennessee Board of Professional Responsibility.

Skinner, who left Boies Schiller in May, declined to comment.

In one phone call with Bloomberg Law, Schuchardt said he remains committed to "clearing his name," insisting his law license was unfairly attacked over his

affiliation with Upright Law. He said Dell'Aquila hadn't paid him hourly fees for the NRA work, noting "I have not yet sued him" for that money. (Dell'Aquila denies he owes the lawyer anything for the case.)

Last month, the Knoxville lawyer asked an appeals court to rescind his suspension, arguing the bankruptcy judge was biased against him and that he was denied a hearing.

But it's not clear he wants to be a lawyer again. On his Wikipedia page, Schuchardt says he has retired from the practice of law, and is now writing a book.

He hopes to take on another giant. In a conversation with Bloomberg Law last week, he didn't want to discuss the book other than sharing its subject: "problems with the US currency."

Late Tuesday, less than a week after being asked to review the case for this article, Kanovitz, the Chicago lawyer, told Bloomberg Law he thought it was so promising, he had reached out to Dell'Aquila to discuss taking the case.

Both men said they hope to sign an agreement this week. The next step: find a Tennessee lawyer to join the case.

(Doc. No. 28-1.)

***2. The August 17, 2022 Article (the Second Article)***

Strom published the Second Article in *Bloomberg Law* on August 17, 2022. It reads in full:

***NRA Donors Revive Near-Dead Lawsuit by Finding New Lawyers***

- NRA donors seeking return of hundreds of millions
- Faced a deadline of Wednesday to find new lawyers

Chicago-based Loevy & Loevy and Southeast law firm Stites & Harbison are now representing the group of disillusioned donors seeking to certify a class-action against one of the most powerful interest groups in US history.

The donors, led by Nashville gun-rights activist David Dell'Aquila, argue the NRA fraudulently solicited donations to protect the Second Amendment but instead used the money to fund its executives' lavish lifestyles. Their allegations mirror ones leveled in a separate lawsuit by New York Attorney General Letitia James.

But their case was derailed and sat dormant for months after the lead lawyer, Knoxville-based Elliott Schuchardt, was suspended from practicing in federal court in Tennessee, as chronicled in a Bloomberg Law story last week.

The litigation froze last summer when Schuchardt tried to enlist potential co-counsel at the powerful firm Boies Schiller Flexner, but the two couldn't agree on Schuchardt's role or his fees. Schuchardt didn't formally withdraw his appearance until this spring.

After the NRA moved to dismiss the case for lack of prosecution, the Nashville-based judge had set a Wednesday deadline for the plaintiffs [sic] to find new lawyers.

Jonathan Loevy and Michael Kanovitz, two partners at Chicago-based Loevy & Loevy, are now representing the donors alongside Stites & Harbison member John Wingo, who's based in Nashville, and Louisville-based members T. Morgan Ward Jr. and Chadwick McTighe.

Loevy & Loevy handles complex litigation and commercial matters but is best known in Chicago for representing wrongfully convicted defendants seeking compensation from the state. The firm found out about the case when Bloomberg Law asked Kanovitz this month to review court documents and provide an independent expert opinion. He told Bloomberg Law the case was "absolutely a viable lawsuit" and days later approached Dell'Aquila and offered to represent him.

"This suit offers a unique opportunity to demand transparency from the NRA and reform the organization," Kanovitz said in a statement. "We will conduct a fulsome investigation and follow the money. Our goal is to correct the misconduct that has been going on behind closed doors and obtain compensation for the people the NRA defrauded."

The NRA is represented in the case by William A. Brewer III. He said in a statement that the organization is "eager to move a case forward that it believes totally lacks merit."

"The NRA is confident in its commitment to good governance, as is evidenced by its defense of NYAG dissolution claims that are no more," Brewer said, referring to a failed effort to dissolve the organization by New York's James.

**Lavish Spending Alleged**

The case seeks to certify a class of NRA donors who could seek returns from late 2015 through early 2019. The NRA took in more than $330 million in donations from 2016 through 2018, according to tax documents.

The case had won an early ruling granting the plaintiffs standing to bring the lawsuit and allowing a fraud claim against the NRA to continue.

Dell'Aquila, the lead plaintiff who had once promised a $10 million donation to the NRA through his estate, has said the case is a vehicle to force management changes at the NRA. He said he has stopped donating to the group and has sought the ouster of NRA Chief Executive Officer Wayne LaPierre.

> "I feel like we won the $1.5 billion lottery," Dell'Aquila said of finding new lawyers. "We were literally down to the wire, with only hours left to obtain new counsel."
>
> The NRA's spending on LaPierre's personal trips and other expenses is the focus of a lawsuit brought by the New York Attorney General' against the gun-rights group. The suit briefly forced the NRA to seek bankruptcy protection.
>
> LaPierre told a bankruptcy judge last year that he failed to disclose yacht trips and other expenses, including a hunting trip in Botswana, in what he acknowledged were violations of the NRA's policies. The bankruptcy was later dismissed, with a federal judge ruling it was used to defend against a regulatory challenge rather than financial difficulties.
>
> James alleges the organization wrongfully spent at least $64 million on personal expenses for executives. Her lawsuit failed in its effort to dissolve the New York-based non-profit, but she won a key ruling in May to continue.

(Doc. No. 28-2.)

### B. Procedural History

Schuchardt initiated this action by filing a complaint asserting claims of defamation, false light, and intrusion-upon-seclusion against Bloomberg L.P. and Strom on December 14, 2022. (Doc. No. 1.) Schuchardt later substituted Bloomberg Industry Group, Inc., which owns *Bloomberg Law*, as the proper defendant. (Doc. Nos. 1-1, 6, 7.) Bloomberg and Strom moved to dismiss Schuchardt's Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted on February 8, 2023. (Doc. Nos. 19–22.)

Schuchardt then filed an Amended Complaint, now the operative pleading, asserting the same state-law claims against Bloomberg and Strom and expanding the original Complaint's factual allegations.[4] (Doc. No. 25.) Bloomberg and Strom filed the present Motion to Dismiss

[4] Schuchardt does not make any argument in support of his intrusion claims in his Response in opposition to the Motion to Dismiss. The court therefore assumes that Schuchardt has waived that claim and considers that portion of the defendants' Motion to Dismiss to be unopposed.

Schuchardt's Amended Complaint under Rule 12(b)(6). (Doc. Nos. 26–28.) Schuchardt opposed the motion (Doc. Nos. 31–33), and Bloomberg and Strom filed a reply (Doc. No. 36).

Schuchardt then moved to strike certain exhibits to the Motion to Dismiss under Federal Rule of Civil Procedure 12(f) on grounds that they contain scandalous and impertinent materials. (Doc. No. 29.) Bloomberg and Strom opposed the motion to strike (Doc. No. 37), and Schuchardt filed a reply (Doc. No. 40).

## II. LEGAL STANDARD

### A. Motion to Dismiss

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim[.]" Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff must plead more than "'labels and conclusions,'" "'a formulaic recitation of the elements of a cause of action,'" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because Schuchardt appears pro se, the court construes his filings "'liberally'" and holds his complaint "'to less stringent standards than formal pleadings drafted by lawyers[.]'"[5] *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "However, this lenient treatment has limits" *Frengler v. Gen. Motors*, 482 F. App'x 975, 976 (6th Cir. 2012), especially when the pro se party has trained and previously practiced as a lawyer. "[C]ourts are not required to conjure up unpleaded allegations or guess at the nature of an argument." *Brown v. Cracker Barrel Rest.*, 22 F. App'x 577, 578 (6th Cir. 2001) (citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

### B. Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that the court may, upon a party's motion or sua sponte, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are viewed with disfavor and are not frequently granted." *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015); *see also Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953) ("[T]he action of striking a pleading should be sparingly used by the courts . . . [and] is a drastic remedy to be resorted to only when required for the purposes of justice."). This reluctance to strike pleadings stems from "the practical difficulty of deciding cases without a factual record." *Brown & Williamson Tobacco Corp.*, 201 F.2d at 822,

---

[5] The court notes that Schuchardt included his Tennessee bar license number in the signature block of his Amended Complaint without indicating that his license to practice law has been suspended. (Doc. No. 25, at 25.) And despite the fact that Schuchardt listed his bar license number, the docket shows that he is proceeding pro se.

and the potentially "dilatory and often harassing character" of a motion to strike, 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1381 (3d ed. updated Apr. 2021). District courts have ample discretion to strike filings under Rule 12(f), and their decisions are reviewed only for abuse of that discretion. *Operating Eng'rs Local 324 Health Care Plan*, 783 F.3d at 1050; *see also Van Loo v. Cajun Operating Co.*, 64 F. Supp. 3d 1007, 1012 (E.D. Mich. 2014) ("A court has 'liberal discretion to strike such filings' as it deems appropriate under Rule 12(f)." (citation omitted)).

## III. SCHUCHART'S MOTION TO STRIKE

Because it relates to what record the court may consider in deciding the defendants' Motion to Dismiss, the court first addresses Schuchardt's Motion to Strike certain exhibits. Schuchardt asks the court to strike Exhibits 4, 5, 7, 8, 9, 10, 16, and 20 to the Declaration of Laura Handman (Doc. No. 28), filed in support of Bloomberg and Strom's Motion to Dismiss (Doc. No. 28). These exhibits are described by Handman as follows:

- Exhibit 4: "a true and correct copy of the December 2019 Decision and Order by the late Chief Judge Pamela L. Reeves in *in re Schuchardt*, No. 3:18-MC-39, 2019 WL 6716992 (E.D. Tenn. Dec. 10, 2019)."

- Exhibit 5: "a true and correct copy of the January 9, 2018 Decision and Order by Judge Suzanne H. Bauknight of the Bankruptcy Court for the Eastern District of Tennessee in *In re Jennifer Nicole Roberts*, 17-bk-31543-SHB (Bankr. Ct. E.D. Tenn).

- Exhibit 7: "a true and correct copy of the October 15, 2020 Decision and Order by Chief Judge Mark Hornak of the Western District of Pennsylvania in *In re Discipline of Elliott J. Schuchardt, PA*, No. MC 20-720-MRH, 2020 WL 6083289 (W.D. Pa. Oct. 15, 2020) suspending Plaintiff in reciprocity to his Eastern District suspension.

- Exhibit 8: "a true and correct copy of the November 17, 2022 Decision and Order by Chief Judge Mark Hornak of the Western District of Pennsylvania in *in re Discipline of Elliott J. Schuchardt, PA*, No. MC 20-720-MRH (W.D. Pa. Nov. 17, 2022) re-suspending Plaintiff from practice for two years . . . ."

- Exhibit 9: "a true and correct copy of the September 21, 2022 Order by the Supreme Court of Tennessee temporarily suspending Plaintiff from practice . . . ."
- Exhibit 10: "a true and correct copy of the January 30, 2023 order by the Supreme Court of Tennessee rejecting Plaintiff's bid for reinstatement . . . ."
- Exhibit 16: "a true and correct copy of an August 7, 2017 affidavit submitted by Plaintiff in *In re Jennifer Nicole Roberts*, No. 17-bk-31452 (Bankr. Ct. E.D. Tenn.) . . . ."
- Exhibit 20: "a true and correct copy of Plaintiff's Wikipedia page, which is referenced in the [August 10, 2022 article] . . . ."

(Doc. No. 28.)

Schuchardt argues that the defendants are "using those documents to attack [his] reputation and character in this proceeding" and that they are therefore appropriately stricken as impertinent or scandalous material. (Doc. No. 29, at 2.) The defendants argue in response that Rule 12(f) only applies to pleadings and not to the declaration exhibits Schuchardt wants to strike here. (Doc. No. 37.) Schuchardt replies that the court has the inherent power to strike materials other than pleadings if it finds that Rule 12(f) is not the appropriate procedural vehicle to do so. (Doc. No. 40.)

By its plain language, Rule 12(f) extends only to material contained in a pleading. Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."); *see also Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006) ("The Federal Rules of Civil Procedure do not require the district court to remove documents other than pleadings from the record in a case."). The Sixth Circuit and this court have established that "[e]xhibits attached to a dispositive motion are not 'pleadings' within the meaning of Fed. R. Civ. P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f)." *Fox*, 173 F. App'x at 375; *see also Kyrstek v. Ruby Tuesday, Inc.*, No. 3:14-CV-01119, 2016 WL 1274447, at *4 (M.D. Tenn. Mar. 31, 2016) (denying motion to strike exhibits to

declaration filed in support of motion to dismiss). Rule 12(f) thus does not provide a basis to strike the exhibits to Handman's Declaration.

Most of the materials Schuchardt seeks to strike are publicly available court orders from proceedings that figure prominently in Schuchardt's claims. The remaining documents are Schuchardt's own affidavit, which he filed in a court proceeding, and Schuchardt's publicly available Wikipedia page. These documents, most authored by judges in the course of their judicial duties, are not the kind of "scandalous" material Rule 12(f) contemplates removing from the record of a court proceeding. *See, e.g.*, *Ciccio v. SmileDirectClub*, LLC, No. 3:19-cv-00845, 2020 WL 2850146, at *5 (M.D. Tenn. June 2, 2020) (describing a scandalous allegation as one "that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court"). *Cf. Fleischer v. A.A.P., Inc.*, 180 F. Supp. 717, 722 (S.D.N.Y. 1959) (striking portions of amended complaint addressing disqualification of counsel because that issue was "collateral to the issues to be litigated and allegations which deal with counsel's actions in the past have no place in the amended complaint"). Schuchardt offers no other meritorious reason for the court to remove these filings from the docket. His motion to strike will be denied.

## IV. THE DEFENDANTS' MOTION TO DISMISS

### A. Consideration of Matters Outside the Pleadings

The fact that the court will not strike the exhibits to Handman's Declaration from the docket does not mean that those filings are appropriately included in the court's consideration of the defendants' Motion to Dismiss. "Generally, at the motion-to-dismiss stage, a federal court may consider only the plaintiff's complaint." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014). Indeed, Rule 12(d) provides that, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be

treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The determination of whether to convert a motion to dismiss into a motion for summary judgment to allow consideration of matters outside the pleadings falls within the district court's discretion. *See Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (holding that "[a] district court's decision to convert a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment under Rule 56 is reviewed for abuse of discretion"). "The court, however, in converting a motion to dismiss must take care to prevent prejudice or surprise to any party." *Ent. Prods., Inc. v. Shelby Cty.*, No. 08-2047, 2009 WL 10699869, at *3 (W.D. Tenn. Sept. 29, 2009).

In addition to the eight exhibits already identified, the exhibits to Handman's Declaration are:[6]

- Exhibit 2: "a true and correct copy of the August 10, 2022 *Bloomberg Law* article . . . ."
- Exhibit 3: "a true and correct copy of the August 17, 2022 *Bloomberg Law* article . . . ."
- Exhibit 6: "a true and correct copy of the September 3, 2021 letter from the Clerk of the Middle District of Tennessee suspending Plaintiff form practice in that district that was publicly filed by David Dell'Aquila in *Dell'Aquila, et al. v. National Rifle Association of America, et al.*, No. 19-cv-00679 (M.D. Tenn.) ("NRA Litigation")."
- Exhibit 11: "a true and correct copy of the September 29, 2022 Complaint filed by Plaintiff against the State of Tennessee, the Tennessee Board of Professional Responsibility, and certain of its employees in *Schuchardt v. State of Tennessee, et al.*, No. 22-cv-00762 (M.D. Tenn.)."
- Exhibit 12: "a true and correct copy of the docket sheet for the NRA Litigation."
- Exhibit 13: "a true and correct copy of the August 26, 2021 letter sent by Peter Skinner of Boies Schiller Flexner LLP terminating his representation of the NRA Litigation plaintiffs that was publicly filed by Dell'Aquila in the NRA Litigation."

[6] The exhibits are numbered from Exhibit 2 to Exhibit 20.

- Exhibit 14: "a true and correct copy of Plaintiffs April 20, 2022 Motion to withdraw as Counsel from the NRA Litigation."

- Exhibit 15: "a true and correct copy of Dell'Aquila's July 25, 2022 motion for additional time to seek counsel" filed in the NRA Litigation.

- Exhibit 17: "a true and correct copy of an article published by *The New York Times* on January 21, 2021 . . . titled *The N.R.A. Wants to 'Dump' Its Regulators via Bankruptcy. Will It Succeed?* in which Plaintiff is quoted . . . ."

- Exhibit 18: "a true and correct copy of an article published by *C-ville* on June 10, 2015 . . . titled *Supreme Court ruling opens door for new leadership at Sweet Briar* in which Plaintiff is quoted . . . ."

- Exhibit 19: "a true and correct copy of an article published by the *New York Law Journal* on November 13, 2020 titled *NRA, Battling on 2 Fronts, Aims to Move AG James' Lawsuit Out of New York City* in which Plaintiff is quoted."

(Doc. No. 28.)

The defendants did not move for summary judgment in the alternative to their Motion to Dismiss, and Schuchardt has not provided any responsive exhibits with his filings. Converting the defendants' Motion to Dismiss to a motion for summary judgment without notice and an opportunity for supplemental briefing would not be appropriate.

However, courts may consider "public records or [matters that] are otherwise appropriate for the taking of judicial notice" without converting a motion to dismiss into a motion for summary judgment. *New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003). "Such public records that a court may consider include documents from other court proceedings." *Watermark Senior Living Ret. Cmtys., Inc. v. Morrison Mgmt. Specialists, Inc.*, 905 F.3d 421, 425–26 (6th Cir. 2018). Accordingly, the court may consider exhibits to Handman's Declaration that are included in the public records of other court proceedings. Exhibits 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16 are public court filings and will be considered. The court has already determined that it will consider Exhibits 2 and 3 because they are the articles that are the subject of Schuchardt's claims and were exhibits to his original Complaint. Finally, the docket

sheet for the NRA Litigation provided as Exhibit 12 is also referenced in Schuchardt's Amended Complaint and is central to his claims and may be considered for that reason. *See Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997).

The court will not consider Exhibits 17, 18, or 19, which are news articles from other publications, or Exhibit 20, which is Schuchardt's Wikipedia page.

**B. Defamation, False Light, and the Fair Report Privilege Under Tennessee Law**

To state a defamation claim under Tennessee law, a plaintiff must allege that "1) a party published a statement; 2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp*., 995 S.W.2d 569, 571 (Tenn. 1999) (citing Restatement (Second) of Torts § 580B (1977)). "Foremost . . . a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990). At the motion to dismiss stage, the court's central inquiry is "whether a communication is capable of conveying a defamatory meaning." *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 708 (Tenn. Ct. App. 2012). This "is a question of law for the court to decide in the first instance; it is then for the jury to decide whether the communication was in fact so understood by those who received it." *Id.* at 708–09.

Under Tennessee law, a statement is defamatory if it

> constitute[s] a serious threat to the plaintiff's reputation. A libel does not occur simply because the subject of a publication finds the publication annoying, offensive, or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule. They must carry with them an element "of disgrace."

*Id.* at 708 (quoting *Kersey v. Wilson*, No. M2005-02106-COA-R3-CV, 2006 WL 3952899, at *3 (Tenn. Ct. App. Dec. 29, 2006) (adopting standard from W. Prosser, *Law of Torts* § 111, p. 739

(4th ed. 1971))). "[T]he subjective impression that the utterance gives to the alleged victim . . . is immaterial; the standard is an objective one i.e. the impression that a 'reasonable person' would draw from the language at issue is the only relevant inquiry for the Court to consider at this stage." *Seaton v. TripAdvisor, LLC*, No. 3:11-CV-549, 2012 WL 3637394, at *5 (E.D. Tenn. Aug. 22, 2012) (quoting *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000)), *aff'd*, 728 F.3d 592 (6th Cir. 2013).[7]

Tennessee also "recognizes the separate, but related, tort of false-light invasion of privacy, which requires: (1) publicity, (2) that places the plaintiff in a false light, (3) that is 'highly offensive to a reasonable person,' and (4) that the defendant knew of or acted with reckless disregard to the 'falsity of the publicized matter and the false light in which the other would be placed.'" *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 601 (6th Cir. 2013) (quoting *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 643–44 (Tenn. 2001)). The defendant to a false light claim "need not have made a literally false statement; rather, it is sufficient that the defendant's statement either *implies* underlying facts that are false or that the overall context of the statement leads to inferences that cast the plaintiff in a false light." *See S.E. v. Chmerkovskiy*, 221 F. Supp. 3d 980, 985 (M.D. Tenn. 2016). At this stage, the court's job is to determine if the identified statements are capable of portraying the plaintiff in a false light that is highly offensive to a reasonable person.

[7] The defendants argue that, because of his high-profile legal career, Schuchardt should be considered "at least a limited purpose public figure" and required to meet the more exacting actual malice standard by alleging that the defendants acted "with knowledge that [their statements were] false or with reckless disregard of whether [they were] false or not." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Because Schuchardt has not adequately pleaded defamation or false light claims under the lower standard applied to claims by private citizens, the court need not consider whether Schuchardt is, in fact, a public figure.

Media defendants to defamation and false light claims may assert a fair report privilege under Tennessee law. The privilege originates from the principle that "a newspaper should not be held liable for republishing allegedly defamatory statements made during a judicial proceeding because such a proceeding 'is open to all the world.'" *Funk v. Scripps Media, Inc.*, 570 S.W.3d 205, 211 (Tenn. 2019) (quoting Kathryn Dix Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report*, 54 N.Y.U. L. Rev. 469, 478 & n.40 (1979)). American courts have "expanded [the fair report privilege] to protect the publication of reports about a variety of official actions or proceedings" on the reasoning "that newspapers should be allowed to report on publicly accessible information." *Id.* (citing David Elder, *Defamation: A Lawyer's Guide* § 3:1 (July 2018 update)). The privilege thus protects "newspapers which make reports of judicial proceedings to the public, in order that members of the public may be apprised of what takes place in the proceedings without having been present." *Smith v. Reed*, 944 S.W.2d 623, 625 (Tenn. Ct. App. 1996).

The privilege applies equally to statements made in open court and in publicly available court records. *Funk*, 570 S.W.2d at 212 (citing *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975) ("At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records.")). A statement subject to the fair report privilege must "be 'a fair and accurate summation of the proceeding,' and must display balance and neutrality." *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 284 (Tenn. Ct. App. 2007). When properly asserted, "[t]he privilege can only be defeated by showing that a report about an official action or proceeding was unfair or inaccurate." *Funk*, 570 S.W.3d at 217.

### C. Identified Defamatory Statements and False Implications

Schuchardt identifies the same twenty-one "particulars" from the First Article and a single statement from the Second Article in support of his defamation and false light claims. (Doc. No. 25 ¶¶ 84, 97, 114, 126.) Much of what Schuchardt identifies are not quotations from the articles but Schuchardt's statements of what he believes the articles should have included—generally details of his feud with Dell'Aquila or steps he asserts Dell'Aquila should have taken to advance the NRA Litigation but did not. The defendants summarize Schuchardt's allegations as "five statements and four purported defamatory 'impressions' from the two Articles." (Doc. No. 27, at 7.) Schuchardt has not objected to the defendants' framing. The court finds that it fairly encompasses Schuchardt's allegations and adopts it for purposes of this opinion.

The five identified defamatory statements are:

1. Headline: How Suspended Lawyer Derailed NRA Donors' $1 Billion Claim

2. The lead plaintiff, Nashville gun rights activist David Dell'Aquila's blames Schuchardt for dooming their chances in court, and, more importantly, Dell'Aquila's bid to reform the organization…

   "This was a great case," Dell'Aquila said in an interview, "until Elliott put his greed ahead of everybody."

3. Schuchardt again demanded a 9% fee.

4. Before he formally joined the case, Schuchardt's license to practice in federal court had been suspended amid a dispute with a bankruptcy judge in Knoxville who questioned his fees, professionalism, and competency.

5. [The NRA Litigation] was derailed and sat dormant for months after the lead lawyer, Knoxville-based Elliott Schuchardt, was suspended from practicing in federal court in Tennessee, as chronicled in a Bloomberg Law story last week.

   The litigation froze last summer when Schuchardt tried to enlist potential co-counsel at the powerful firm Bois Schiller Flexner, but the two couldn't agree on Schuchardt's role or his fees. Schuchardt didn't formally withdraw his appearance until this spring.

(*Id.*)

The defendants identify the alleged "defamatory implications" as:

1. Schuchardt was responsible for delays in the NRA Litigation.
2. Schuchardt created a '$1 billion loss' in connection with the NRA Litigation.
3. Schuchardt had an 'obligation' to enter into an agreement with attorney Peter Skinner to provide co-counsel in the NRA Litigation.
4. Schuchardt was responsible [for] Dell'Aquila's delays in retaining new counsel.

(*Id.*)

There is no question that the statements were published on *Bloomberg Law*, and the defendants have not argued that Schuchardt did not plead injury adequately. The court's consideration of the Motion to Dismiss, therefore, focuses on the identified statements' legal significance.

#### ***1. Application of the Fair Report Privilege: Statements One, Four, and Five and Implications One and Two***

The defendants argue that the fair report privilege applies to Statements 1, 4, and 5 and to the implication that Schuchardt caused delays in the NRA Litigation and a $1 billion loss for the NRA Plaintiffs. Statements 1, 4, and 5 address federal court litigation—the NRA Litigation and the Bankruptcy Court and District Court proceedings surrounding Schuchardt's suspension from practice in the Eastern District of Tennessee—and, thus, are "report[s] of an official action or proceeding" for purposes of the fair report privilege.[8] *Lewis*, 238 S.W.3d at 285. The court must therefore determine whether the statements are "fair and accurate summation[s]" of those

[8] Schuchardt argues that the fair report privilege does not apply to the subject statements because it "does **not** apply to a private conversation, where one party has an axe to grind against another party – such as the private conversations between Dell'Aquila and Journalist Roy Strom." (Doc. No. 32, at 19.) Schuchardt is correct that the fair report privilege applies only to "public proceedings or official actions of the government that have been made public." *Burke v. Sparta Newspapers, Inc.*, 592 S.W.3d 116, 123 (Tenn. 2019). The defendants do not argue that the privilege should apply to communications between Dell'Aquila and Strom.

proceedings. *Smith*, 944 S.W.2d at 625; *see also Funk*, 570 S.W.3d at 217. To determine if the subject statements are unfair or inaccurate so as to defeat the privilege, the court compares them to the records of the public proceedings. *Burke*, 592 S.W.3d at 123. "By this comparison, judges and lawyers can readily determine whether such a report is fair and accurate and entitled to the protection of the privilege." *Id.* In this way, application of the fair report privilege dovetails with "[t]he most basic feature of a Tennessee state-law defamation claim"—"that it does not apply to truthful assertions, no matter how reputationally harmful they might be." *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 508 (6th Cir. 2015).

*a) Statement One and Implications One and Two*

Schuchardt alleges that Statement One—the First Article's headline "How Suspended Lawyer Derailed NRA Donors' $1 Billion Claim"—is defamatory because it "created the false and misleading impression that Schuchardt was responsible for 'a $1 billion loss,' in connection with the NRA case. In reality, there was no loss whatsoever . . . . On the contrary, Dell'Aquila had defrauded Schuchardt in the case, at a cost of thousands of dollars." (Doc. No. 25 ¶¶ 64–65.) Because it is a headline, the court must consider Statement One in the context of the First Article as a whole. *See Black v. Nashville Banner Pub. Co.*, 141 S.W.2d 908, 912 (Tenn. Ct. App. 1939) ("The rule is general that both the headline and the item to which it is attached are to be considered as one document in determining the effect of an article complained of as being defamatory."); *see also Croce v. New York Times Co.*, 930 F.3d 787, 794 (6th Cir. 2019) (applying analogous Ohio defamation law for the proposition that "the headline is not the whole story, and consequently the headline cannot be considered standing alone").

First, the court notes that Schuchardt refers to "'a $1 billion loss'" throughout his Amended Complaint and opposition to the defendants' Motion to Dismiss as if he is quoting that language from the Articles. But the word "loss" does not appear in either article, and neither article states or

implies that the NRA Plaintiffs have lost their claims or their money. Indeed, the Second Article's headline announces that the NRA Plaintiffs have "revive[d]" their "near-dead lawsuit," and it concludes with Dell'Aquila's statement that he "'feel[s] like we won the $1.5 billion lottery." (*See* Doc. No. 28-2.) Schuchardt's characterization of Statement One as implying that he caused the NRA Plaintiffs a $1 billion loss is simply his subjective impression.

In reality, the First Article's headline states that Schuchardt "derailed" the NRA Plaintiffs' "$1 billion claims." To "derail," in its figurative usage, means "to throw (something, such as a plan or project) off course." *Derail*, Merriam-Webster's Unabridged Dictionary, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/derail (last visited March 14, 2024); *see also Oxford English Dictionary*, https://doi.org/10.1093/OED/5860988791 (last visited March 14, 2024) (providing, as an additional and figurative definition of "derail," "[t]o impede, disrupt, or thwart (an activity, proceeding, plan, etc.) by diverting it from its intended or expected course."). In legal parlance, "derail[ing] the course" of a case is commonly equated with causing "months of delay." *Bunt v. Clarksville Montgomery Cty. Sch. Sys.*, No. 3:19-cv-01013, 2020 WL 13826867, at *3 (M.D. Tenn. Oct. 29, 2020) (Trauger, J.); *see also United States v. Thompson*, 89 F.4th 1010, 1020 (7th Cir. 2024) (noting that a jury could find that the defendant had "tried to influence the FDIC by derailing, or at least delaying," investigation into his finances); *United States v. Walsh*, 47 F.4th 491, 501 (7th Cir. 2022) (holding that the defendant's "tirade" against the judge was "motivated . . . by a desire to delay or derail his sentencing"); *Trump v. Thompson*, 20 F.4th 10, 48 (D.C. Cir. 2021) (upholding the denial of preliminary injunction on the grounds that the plaintiff sought it to "delay" legislative work and "derail" political negotiations and accommodation). Thus, in its most unfavorable reading, Statement One can be understood to mean

that Schuchardt caused a delay that steered the NRA Litigation off its intended course and, as the article later states, onto "a path to failure." (*See* Doc. No. 28-1.)

This is not an unfair or inaccurate characterization. When the First Article was published, the NRA Litigation—with Schuchardt as the plaintiffs' only counsel—had sat dormant for more than fourteen months, and the NRA had filed a motion to dismiss the action due to the plaintiffs' failure to prosecute their claims. Contrary to Schuchardt's argument, the First Article does not ignore the role of the NRA's bankruptcy proceedings in that delay. The First Article states that, "by January 2021 the NRA had filed for bankruptcy protection in Texas" and, as a result, "the class action would be stayed in Tennessee." (*Id.*) But it also accurately reports that "the bankruptcy case was short-lived" and "tossed . . . in May 2021." (*Id.*) This meant that "the class action, with Schuchardt at the helm, was back on the front burner in Tennessee federal court." (*Id.*)

Whether (following Strom's metaphors) Schuchardt was to steer the ship or stir the pot, he did neither. In administratively closing the case to accommodate the bankruptcy's automatic stay, the court ordered that, "[w]ithin TEN DAYS of the conclusion of the bankruptcy proceedings, [the NRA] shall file a status update, and Plaintiffs may move to reopen the case." (*Id.*) The NRA filed a status update notifying the court that its bankruptcy had concluded on May 18, 2021. But Schuchardt did not file anything until he informed the court by letter of his suspension from practice in the Eastern District of Tennessee on September 1, 2021. After this court notified him on September 3, 2021 that he was subject to a reciprocal suspension and could not practice here, he did not move to withdraw from representing the NRA Plaintiffs until April 20, 2022, more than a week after the NRA filed its motion to dismiss for failure to prosecute. Based on this record, it is neither unfair nor inaccurate to state that Schuchardt, as the NRA Plaintiffs' only lawyer, caused undue delay that put the NRA Litigation at risk of dismissal.

As for the $1 billion valuation of the NRA Plaintiffs' claims, the First Article states: "If the plaintiffs successfully argue that all donations to the NRA were collected fraudulently, they could seek to recoup contributions made from late 2015 through early 2019—a sum in excess of $330 million" that could be trebled "if the RICO allegation had held or was reinstated . . . ." (Doc. No. 28-1.) In the following paragraph, attorney Michael Kanovitz describes the $1 billion damages estimate as "probably pie-in-the-sky money." (*Id.*) But Kanovitz does not state that those aspired-to damages have been lost. Rather, he describes the case as "absolutely a viable lawsuit," and the article concludes with a statement that Kanovitz found the action "so promising" that he had "reached out to Dell'Aquila to discuss taking the case."[9] (*Id.*)

Statement One and Implications One and Two are protected by the fair report privilege and do not support Schuchardt's defamation or false-light claims.

*b) Statement Four*

Statement Four is the First Article's assertion that, "[b]efore he formally joined the case, Schuchardt's license to practice in federal court had been suspended amid a dispute with a bankruptcy judge in Knoxville who questioned his fees, professionalism, and competency." (Doc. No. 27, at 7.) Schuchardt alleges that this statement is false because "[n]o bankruptcy judge has ever questioned Schuchardt's fees. The fees at issue were those charged by Upright Law." (Doc. No. 25 ¶ 84(u).) The defendants argue that Statement Four "exactly echoes both the Bankruptcy Court's language and the Eastern District's description of the proceedings" and that the fair report privilege therefore should apply. (Doc. No. 27, at 13.)

In her January 9, 2018 show-cause order addressing Schuchardt's conduct in seventeen bankruptcy proceedings, Judge Bauknight described Schuchardt's "crusade against the Chapter 13

[9] Kanovitz is now counsel of record for the NRA Plaintiffs. (Doc. No. 28-11.)

Trustee" and "pattern of blatant disregard for the Local Rules, practices, and procedures of [the bankruptcy court]," which culminated in a "hearing on the Chapter 13 Trustee's objection to Mr. Schuchardt's request for the maximum allowable flat fee under [the bankruptcy court's local rules]." (Doc. No. 28-4, at 6–7.) Judge Bauknight recounted a show-cause hearing "concerning the reasonableness of fees charged to Chapter 7 debtors by Mr. Schuchardt in his capacity as a local partner of UpRight Law, LLC" in six bankruptcies and Schuchardt's admission at that hearing that his fee accountings "were false . . . ." (*Id.* at 8.) In her December 10, 2019 order suspending Schuchardt from practice in the Eastern District of Tennessee, Chief Judge Reeves described Judge Bauknight's "hearing regarding Schuchardt's fees in six cases" and included that, "following Judge Bauknight's reduction of his fees, Schuchardt accused Judge Bauknight of having *ex parte* communications with Chapter 13 Trustee Gwendolyn Kerney." (Doc. No. 28-3, at 12.) Judge Bauknight ordered Schuchardt to show cause why he should not be suspended from practice for failing to meet the standards of professionalism and competency set by the Tennessee Rules of Professional Responsibility; Chief Judge Reeves found that Schuchardt had violated those rules on multiple occasions.

The records of these judicial proceedings establish that Statement Four's assertion that "Schuchardt's license to practice in federal court had been suspended amid a dispute with a bankruptcy judge in Knoxville who questioned his fees, professionalism, and competency" is an accurate recounting.[10] The fair report privilege applies.

[10] Schuchardt's argument that there is a distinction between fees charged by an attorney and fees charged by the firm in which the attorney is a partner is unsupported by authority.

*c) Statement Five*

Statement Five is a quotation from the Second Article that asserts, first, that the NRA Litigation "was derailed and sat dormant for months after the lead lawyer, Knoxville-based Elliott Schuchardt was suspended from practicing in federal court in Tennessee"; second, that "[t]he litigation froze last summer when Schuchardt tried to enlist potential co-counsel at the powerful firm Bois Schiller Flexner, but the two couldn't agree on Schuchardt's role or his fees"; and third, that "Schuchardt didn't formally withdraw his appearance until this spring." (Doc. No. 27, at 7.) The first assertion is protected by the fair report privilege for the reasons articulated regarding Statement One. The third assertion is an accurate representation of Schuchardt's motion to withdraw filed on April 20, 2021 and is also protected by the fair report privilege.

Statement Five's second assertion, however, addresses extra-judicial negotiations between Schuchardt and Schiller. The fair report privilege does not apply to that portion of the statement. The court therefore must consider whether that portion of Statement Five is capable of conveying a defamatory meaning or placing Schuchardt in a tortious false light.

***2. Defamatory Meaning or False Light: Statements Two, Three, and Five and Implications Three and Four***

Statements Two and Three, Implications Three and Four, and the remaining clause of Statement Five address Schuchardt's negotiations with Skinner to take over as counsel for the NRA Plaintiffs. Schuchardt alleges that these statements falsely imply that he "had an obligation to enter into an agreement with . . . Skinner to provide co-counsel in the NRA case" and that he "blocked a potential deal with Skinner due to 'greed.'" (Doc. No. 25 ¶ 84.) Schuchardt further alleges that the article "fails to point out that Dell'Aquila intentionally interfered with the proposed agreement with Skinner," that Schuchardt "had no obligation to agree to any terms with Skinner," and that, "[i]n any event, Schuchardt accepted Dell'Aquila's proposed terms." (*Id.*) The defendants

argue that these statements are not capable of conveying defamatory meaning because they are Dell'Aquila's opinion or not capable of subjecting Schuchardt to public scorn or placing him in a false light.

There is not "a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990). Rather, statements that consist of "rhetorical hyperbole, a vigorous epithet" or "loose, figurative, or hyperbolic language" are protected because they "cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Id.* at 20 (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988)). Tennessee courts generally recognize that "an opinion may be actionable if the communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000) (citing Restatement (Second) of Torts § 566 (1977)). The Sixth Circuit has proposed

> at least four factors that a court should consider in determining whether a statement is protected hyperbole or is capable of carrying a defamatory meaning:
>
> (1) The common usage or meaning of the allegedly defamatory words themselves, whether they are commonly understood to be loose, figurative, or hyperbolic words;
>
> (2) The degree to which the statements are verifiable, whether the statement is objectively capable of proof or disproof;
>
> (3) The immediate context in which the statement occurs; and
>
> (4) The broader social context into which the statement fits.

*Jolliff v. N.L.R.B.*, 513 F.3d 600, 612–13 (6th Cir. 2008).

*a) Statements of Dell'Aquila's Opinion*

The statements that Dell'Aquila "blames Schuchardt for dooming [the NRA Plaintiffs'] chances in court, and, more importantly, Dell'Aquila's bid to reform the organization" and that Dell'Aquila considered the NRA Litigation to be a "great case" until Schuchardt "put his greed

ahead of everybody" are the type of "loose, figurative, or hyperbolic language" that "negate the impression that the writer [or speaker] was seriously maintaining" an assertion of fact. *Milkovich*, 497 U.S. at 21. None of the reported descriptive language is objectively verifiable, nor is such language commonly understood as conveying actual facts. *Compare Armstrong v. Shirvell*, 596 F. App'x 433, 442 (6th Cir. 2015) (holding defendant's statements, including that plaintiff was "a radical homosexual activist, racist, elitist, & liar" and "anti-Christian bigot" who "tende[d] toward sexual promiscuity" and was "acting like a gay Nazi," were "capable of defamatory meaning because they can reasonably be interpreted as conveying actual facts") *with Boladian v. UMG Recordings, Inc.*, 123 F. App'x 165, 170 (6th Cir. 2005) (holding that statement that plaintiff was a "disgrace to the species" was protected under *Milkovich*) and *Stilts v. Globe Int'l, Inc.*, 950 F. Supp. 220, 221 (M.D. Tenn. 1995) (finding statements that plaintiff "ripped off" clients and "couldn't be trusted" not capable of defamatory meaning). *See also Lagan v. Windle*, No. 2:19-CV-00050, 2020 WL 2494457, at *2 (M.D. Tenn. May 13, 2020) (finding defendant's statements that plaintiff was an "Irish gangster" and "thief" protected while statements that plaintiff controlled and mismanaged a corporate entity were not).

"Moreover, context is critical," *Boladian*, 123 F. App'x at 170, and the placement of these statements in the First Article emphasizes that they are to be understood as rhetorical flourish. Dell'Aquila's statements are immediately followed by Strom's recounting of "two short phone conversations" with Schuchardt, in which Schuchardt "said Dell'Aquila was trying to shift blame for his own failure to find a lawyer," "threatened to sue if his former client slandered him," and "defended his record" by saying he performed "excellent legal work . . . for all of these clients." This juxtaposition makes clear that both men's statements are posturing in a larger dispute, not assertions of fact.

These statements are not capable of conveying a defamatory meaning and do not place Schuchardt in a false light.

*b) Statements Regarding Negotiations with Skinner*

The final statements at issue address Schuchardt's attempt to bring on Skinner as co-counsel for the NRA Plaintiffs. Schuchardt objects to the First Article's statement that he "again demanded a 9% fee" from Skinner and the Second Article's statement that the NRA Litigation "froze" when Schuchardt and Skinner "couldn't agree on Schuchardt's role or his fees." Schuchardt argues that these statements create a false implication that he was responsible for finding new counsel for the NRA Plaintiffs and do not acknowledge that he "had no obligation to agree to any terms with Skinner" or that he ultimately accepted Dell'Aquila's proposed terms. (Doc. No. 25¶ 84.) The defendants argue that these statements are not capable of conveying a defamatory meaning when they are read as part of the Articles.

These statements do not convey the defamatory meaning or false light that Schuchardt ascribes to them when they are considered in context. Instead of implying that Schuchardt was responsible for finding new counsel for the NRA Plaintiffs, the First Article begins with a statement: "[w]hy no firm has signed on to a case that won an early ruling . . . remains something of a mystery." Schuchardt's negotiations with Skinner are not introduced as part of his obligation to find new counsel for the plaintiffs but as having been initiated because the NRA "already had five lawyers enter appearances on its behalf" and Schuchardt "needed help."

The First Article states that Schuchardt "halted work on the class-action" but did not withdraw from representation when this court informed him that he had "been ineligible to practice [here] before he even filed an appearance in the NRA case" and that "[t]he case sat dormant for months" for that reason. In the Second Article, the statement that the "litigation froze" when Schuchardt and Skinner "couldn't agree on Schuchardt's role or his fees" is bookended by a

statement that the NRA Litigation "was derailed and sat dormant for months after [Schuchardt] was suspended from practicing in federal court in Tennessee" and a statement that Schuchardt "didn't formally withdraw his appearance" for the NRA Plaintiffs for almost a year. Again, these statements are accurate reflections of judicial proceedings and are shielded by the fair report privilege. Finally, the First Article states that "a lawyer representing Dell'Aquila in a separate matter wrote Schuchardt and told him it was his responsibility to find alternate counsel in the class action or be held liable for any losses," placing that assertion squarely in the subjective context of the ongoing feud between Schuchardt and Dell'Aquila.

These statements are not capable of conveying a defamatory meaning and do not portray Schuchardt in an actionably offensive false light.

## V. CONCLUSION

For these reasons, Schuchardt's Motion to Strike (Doc. No. 29) will be denied, and the defendants' Motion to Dismiss Schuchardt's Amended Complaint (Doc. No. 27) will be granted.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge